IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| VERONICA R. PARSON,<br>  Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>  Defendant. | Case No. 4:13-cv-04045-JEH |

**Order and Opinion**

Now before the Court is the Plaintiff's, Veronica R. Parson's, Motion for Summary Judgment (Doc. 13) and the Defendant's, Commissioner of Social Security's, Motion for Summary Affirmance (Doc. 17). For the reasons stated herein, the Court AFFIRMS the Administrative Law Judge's decision denying Parson's claim for benefits.[1]

**I**

In February 2010, Parson filed an application for supplemental security income, alleging disability beginning on January 22, 2010. Her claim was denied initially on September 29, 2010, and was denied upon reconsideration on February 15, 2011. On February 25, 2011, Parson filed a request for hearing concerning her application for supplemental security income. A hearing was held before the Honorable Shreese M. Wilson (ALJ) on February 15, 2012, at which time Parson was represented by an attorney. Following the hearing, Parson's claim was denied. Parson's request for review by the Appeals Council

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 11) on the docket.

1

was denied on April 23, 2013, making the ALJ's decision the final decision of the Commissioner. Parson filed the instant civil action seeking review of the ALJ's decision on May 8, 2013.

II

At the time she applied for benefits, Parson was a 42 year old married woman living in the Quad Cities. At the time of the hearing on February 15, 2012, Parson was living in a halfway house and was separated from her husband.

At the hearing, Parson testified that she dropped out of school in the 11th grade because she was having babies. She testified that she had no income, and bought her groceries with food stamps. Regarding her past work, Parson testified that she never really had a job that she went to every day because for a major part of her life she always depended upon her husband or a man to take care of her.

Parson also testified that she had been off drugs and alcohol since September 2011, and she regularly saw her treating psychiatrist, Dr. Eric Ritterhoff, for her depression. Parson testified that she was sleeping more than when she was using drugs and alcohol. She testified that her depression messed with her concentration. In regard to her lower left leg fracture, Parson testified that she had a limp and could stand for two to three hours a day as a result of the fracture. She explained that she could stand on her left leg for about a half an hour, then get off of it, and then could stand back up on it. Parson further testified that she elevates her leg every time she sits down for a total of a half hour every day. She explained that she elevated her leg because otherwise, she had sharp pains through her leg when sitting down. Parson also explained that she took Tylenol, as needed, for her leg pain.

Parson testified that she spent her days by watching TV, going to the grocery store, going to doctors' appointments, and going to see her probation

officer. She attended AA meetings as well. Parson also stated that she would take the bus to the library to get on the computer, or she would ride the bus around just to get out. She said she liked to be with her grandchildren. Parson further testified that she felt like she was in a zone and did not feel like doing much of anything all the time.

The ALJ then questioned the Vocational Expert (VE), Alfred Walker. The ALJ asked the VE to initially assume an individual who was 44 years old with a limited 10th grade education, previously had some work activity but none that amounted to substantial gainful activity, had no exertional limitations, was limited to performing no more than simple routine tasks that could be learned within 30 days, should be in an environment that was fairly low stress (defined as no more than occasional decision-making or changes in a work setting), and in a job where the tasks and environment were basically unchanging. The ALJ further asked the VE to assume that the individual should have no more than occasional contact with the general public, co-workers, or supervisors. The VE responded with light strength, unskilled jobs including cafeteria attendant, laundry worker, and housekeeper.

The ALJ then asked the VE to assume that the hypothetical individual would need to be in an environment that was free of fast-paced production requirements, in other words, there would not be hourly production quotas for that individual. The ALJ asked the VE if such a limitation would affect the identified jobs. The VE answered in the negative.

The ALJ then asked the VE to assume that the hypothetical individual was limited to performing no more than light and sedentary work activity, that the individual could sit, stand, or walk up to six hours each in an eight hour workday, and that the individual would need the ability to alternate sitting and standing at least once an hour throughout the course of an eight hour workday.

The ALJ further articulated that the individual would need to stand if just sitting, would need to sit if just standing, and that the individual would have to remain in the alternated position five minutes. The VE responded that such limitations would not affect the identified jobs.

The ALJ next asked the VE to assume that the hypothetical individual was likely able to show up for work every day, but that the individual was not necessarily going to be able to be productive the whole time at work so that the individual would be off task up to 20 percent of the day. The VE responded that the individual would not be able to perform the identified jobs, and that there would be no other jobs because an employer would not tolerate that much off-task behavior.

Thereafter, Parson's attorney questioned the VE as to whether there were any limitations in the first hypothetical the ALJ presented on maintaining attention, concentration, or pace. The VE responded that he did not think so.

### III

In her Decision, the ALJ found that Parson had the severe impairments of history of fracture of lower left extremity, status post surgery, and affective mood disorder. The ALJ discussed Parson's left distal tibia and fibula fracture with displacement that occurred on January 22, 2010, as well as the treatment notes pertaining to the time post-surgery. The ALJ addressed Parson's medical records that pertained to her history of treatment for affective mood disorder, the type observed, objective symptoms, and treatments used. The ALJ also noted Parson's history of prior drug and alcohol abuse, stating that her medical treatment notes suggested that the history of use did not significantly limit her ability to perform basic work activities.

The ALJ addressed Listing 1.02A (major dysfunction of a joint (due to any cause)), Listing 1.06 (fracture of femur, tibia, pelvis or one or more of the tarsal

4

bones), the inability to ambulate effectively as defined in Listing 1.00B2b, Listing 12.04 (affective disorders), Listing 12.06 (anxiety related disorders), and Listing 12.09 (substance addiction disorders). She also went into detail when considering the Paragraph B and Paragraph C criteria of 12.04 and 12.06.

The ALJ found that Parson had the following Residual Functional Capacity (RFC):

> To perform light work as defined in 20 CFR 416.967(b) except the ability to alternate between sitting and standing 1 time per hour for at least 5 minutes; simple, routine and repetitive type jobs; low stress (with no more than occasional decision making or changes in a work setting); and an environment free of fast-paced production requirements; and no more than occasional contact with the general public, coworkers, or supervisors.

(AR 18).

Also, the ALJ discussed what Parson said she could and could not do because of her left leg and depression and the activities she previously engaged in. The ALJ discussed Parson's ex-boyfriend's, Gary Teague's, Third Party Function Report. The ALJ also addressed Parson's work history, and the ALJ's conclusion from which was that Parson's "unemployment since her alleged onset date [was] not the result of the combined effects of her alleged impairments." (AR 20). The ALJ articulated her observations of Parson during the February 15, 2012 hearing, and also detailed why the clinical and objective evidence of record did not support the extreme pain symptoms Parson alleged.

The ALJ additionally discussed treating Dr. Ritterhoff's treatment notes, January 22, 2010 Emergency Department records, an August 26, 2010 DDS psychological evaluation by Licensed Clinical Psychologist Stephen Paul Singly, February and March 2010 medical records from Parson's time at Trinity Medical

Center and the Robert Young Center, Illinois DDS records, and treatment records from January through April 2012 from the Robert Young Center.

## IV

Parson argues three points: 1) the ALJ erred by failing to consider Parson's extreme obesity in assessing her residual functional capacity; 2) the ALJ erred in failing to alert the VE to limitations in attention, concentration, and persistence that she found to be supported by the record; and 3) the ALJ erred in failing to consider the nature of Parson's problems interacting with others at the job site.

"The final determination of the Commissioner of Social Security after a hearing under [42 USC § 1383(c)(1)] shall be subject to judicial review as provided in section 405(g) of [Title 42] to the same extent as the Commissioner's final determinations under section 405 of [Title 42]." 42 USC § 1383(c)(3). Pursuant to 42 USC § 405(g), the Commissioner's findings must be sustained by the Court if they are supported by "substantial evidence." 42 USC § 405(g). The entire administrative record must be reviewed for substantial evidence which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v Astrue*, 478 F3d 836, 841 (7th Cir 2007), quoting *Richardson v Perales*, 402 US 389, 401 (1971). The Court may not substitute its judgment for that of the ALJ. *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002).

## A

Parson first argues that the ALJ erred in failing to consider her extreme obesity in assessing her RFC. Specifically, Parson argues that an ALJ has a duty to consider the effects of all of a claimant's combined impairments, including obesity. She argues that the failure to consider her extreme obesity here was

error, especially where Parson complained of leg pain and the inability to stand or walk for prolonged periods. Parson accordingly argues that the ALJ's finding that she could stand for the time necessary to do light work is not supported by substantial evidence. Parson contends the ALJ's error in this regard was not harmless because the ALJ presented the VE with inherently contradictory criteria; the ALJ told the VE to assume Parson could sit and stand for six hours each (light and sedentary work) and to also assume that the individual must alternate positions at will, but at least one time each hour.[2]

The Commissioner counters that that ALJ's failure to specifically address Parson's obesity constituted harmless error. The Commissioner argues that the ALJ adequately considered the evidence that Parson cites in her Memorandum in support of her Motion for Summary Judgment, and so the ALJ reasonably concluded that Parson was capable of working despite her history of left leg fractures. The Commissioner also counters that while Parson's height of 5 feet and six and a half inches and weight of 250 pounds put her into the category of obese, the ALJ's failure to specifically acknowledge Parson's obesity constituted harmless error because Parson does not explain how her obesity limits her ability to work. In regard to Parson's argument that the ALJ presented the VE with inherently contradictory criteria, the Commissioner argues that the ruling cited by Parson, SSR 83-12, to support her argument is inapplicable and she otherwise fails to cite to any other evidence in the record to support her assertion that she was unable to perform either light or sedentary work.

---

[2] SSR 83-12 provides that an individual who must alternate periods of sitting and standing is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work or the prolonged standing or walking contemplated for most light work. SSR 73-12 further provides, however, that persons who could adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.

The ALJ's failure to specifically discuss Parson's obesity was harmless error. The parties agree that the ALJ was required to consider the combined effects of all of Parson's impairments, including her obesity, on her ability to work. Moreover, the Commissioner does not dispute that at five feet, six and a half inches and 250 pounds Parson was in the category of "obese." Nevertheless, just as the Commissioner argues, the ALJ's failure to explicitly discuss Parson's obesity is not, alone, sufficient to find the ALJ's error warrants remand. An ALJ's failure to mention a claimant's obesity does not warrant remand where remanding for explicit consideration would not affect the outcome of the case. *Skarbek v Barnhart*, 390 F3d 500, 504 (7th Cir 2004) (rejecting claimant's argument that the ALJ erred by failing to consider his weight where he did not specify how his obesity further impaired his ability to work and only speculated that his weight made it more difficult to stand and walk); *Villano v Astrue*, 556 F3d 558, 562 (7th Cir 2009) (explaining that a failure to consider the effect of obesity is subject to harmless-error analysis); *Hisle v Astrue*, 258 F App'x 33, 37 (7th Cir 2007) ("This court has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity").

Though Parson makes much ado about the ALJ's failure to explicitly consider her obesity, Parson does nothing more than speculate that her weight affected her ability to stand for prolonged periods. See *Skarbek*, 390 F3d at 504. She does not explain how her obesity limited her ability to work beyond that which the ALJ determined as set forth in the RFC. The ALJ's Decision considered at length Parson's alleged left leg pain and her mobility issues (both alleged and objectively observed), and the ALJ addressed the fact that Parson's hardware failed. Notably, as the Commissioner points out, no medical source in

8

the record opined that Parson had limitations due to her obesity. Though the ALJ did not explicitly discuss Parson's obesity, the Court is still able to sufficiently trace the path of the ALJ's reasoning which reveals that she considered all the relevant evidence of the pain and limitations caused by Parson's left leg in making her RFC finding. See *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993) (requiring the ALJ to sufficiently articulate his assessment of the evidence to assure the court that the ALJ considered the important evidence and to enable the court to trace the path of the ALJ's reasoning).

The ALJ's hypothetical question to the VE, which Parson says was inherently contradictory, provided:

> And if I add to the hypothetical that you assume that the individual were limited to performing no more than light and sedentary work activity but the individual – the individual could sit, stand or walk up to six hours each in an eight-hour workday but they would need the ability to alternate sitting and standing at least once an hour throughout the course of an eight-hour workday.
> If they're standing they would need to sit, if they're sitting they would need to stand and remain in the alternated position for five minutes. I'm assuming while they're in the alternated position there would still be tasks that, that could be performed. Would that affect those jobs that you identified?

(AR 73). The VE responded, "No, Your Honor, it would not." (AR 73). Parson contends that it is unknown to which of the limitations the VE responded. Parson also contends that a person limited to sedentary work with a need to alternate positions represents a more restricted range of work than testified to by the VE, so remand is necessary to allow the VE to testify about how much more restricted the occupational base would be given the ability to do only sedentary work.

The Social Security Rulings cited by Parson all make clear that where there is a limitation on an individual's ability to sit or stand, a vocational resource

should be consulted to clarify the implications for the occupational base or to determine whether the individual is able to make an adjustment to other work. See SSR 83-12 ("In cases of unusual limitation of the ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base"); SSR 96-9p ("It may be especially useful in [situations with the need to alternate required sitting of sedentary work with standing and possibly walking that cannot be accommodated by scheduled breaks and a lunch period] to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work").

Here, the ALJ did as the Social Security Rulings suggest, and consulted the ALJ about whether the need to alternate sitting and standing at least once per hour during the course of an eight-hour workday would affect the identified jobs of cafeteria attendant, laundry worker, or housekeeper where the individual could sit, stand, or walk up to six hours each in an eight-hour workday. Though Parson says that it is unknown to which of the limitations the VE responded, nothing in the hearing transcript suggests that the VE believed there was a contradiction in what the ALJ presented to him regarding Parson's ability to sit, stand, or walk and her need to alternate sitting and standing. Given the VE's expertise in such matters, it is clear from his straightforward response to the ALJ's question that he understood the question and did not see any contradiction in the criteria presented. Furthermore, beyond emphasizing her obesity, Parson does not cite to any other evidence in the record in support of her assertion that she was unable to perform either light or sedentary work that the ALJ did not discuss.

### B

Next, Parson argues that the ALJ erred in failing to alert the VE to limitations in attention, concentration, and persistence that the ALJ found to be

10

supported by the record. Parson argues that the ALJ's method of questioning the VE was in error because it prohibited him from considering physical, psychological, or cognitive limitations that he may have absorbed through reviewing the evidence or by listening to the hearing testimony. Parson also argues that nowhere in the ALJ's questions to the VE did she make explicit reference to limits in attention or concentration. The Commissioner disputes that the ALJ's method of questioning the VE was done in error and that there were additional work-related limitations caused by her moderate difficulties in concentration, persistence, or pace.

The parties do not dispute that an ALJ must orient the VE to the totality of the claimant's limitations, including those pertaining to deficiencies in concentration, persistence, or pace. *O'Connor-Spinner v Astrue*, 627 F3d 614, 619 (7th Cir 2010). While Parson essentially argues that the ALJ's method of questioning the VE in this case precluded the VE from considering Parson's limitations in concentration, persistence, and pace, the hypotheticals the ALJ presented to the VE *did* orient the VE to the totality of Parson's limitations in those areas as supported by the record. Unlike in *Young v Barnhart*, the increasingly restrictive hypotheticals the ALJ presented to the VE here included all of the necessary information, namely, all of Parson's limitations that were support by the evidence of record. See *Young v Barnhart*, 362 F3d 995, 1003-04 (7th Cir 2004) (explaining why asking the VE a series of hypothetical questions with increasingly debilitating limitations was problematic and did not support the ALJ's finding that the claimant was not disabled).

Additionally, Parson places too much emphasis on what the ALJ did and did not make explicit in her hypotheticals to the VE. The Seventh Circuit has "let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically

11

excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F3d at 619. "Only if the record shows that a doctor used particular descriptive language to describe what work a claimant can perform in spite of his limitations can the ALJ use that language in the RFC or hypothetical question to the VE." *Conley v Astrue*, 692 F Supp 2d 1004, 1009 (CD Ill 2010).

Here, the ALJ's first hypothetical included limitations to "simple routine tasks" that could be "learned within 30 days," a "fairly low stress" work environment, and an environment that was "going to be pretty much the same and basically unchanging." (AR 72). State agency reviewing psychologist Kirk Boyenga, Ph.D., translated his findings into a specific RFC assessment which included that Parson was capable of "performing simple tasks" and that her "[a]daptation abilities [were] also limited, but allow[ed] routine, repetitive tasks." (AR 362). Clearly, the ALJ used Dr. Boyenga's RFC assessment to formulate the hypothetical she presented to the VE. The ALJ therefore did not err in her articulation of Parson's limitations in terms of concentration, persistence, or pace. See *Conley*; and *Johansen v Barnhart*, 314 F3d 283, 289 (7th Cir 2002) (concluding that doctor's opinion of claimant's mental RFC as "moderately limited," translated by the doctor into "low-stress, repetitive work" was reasonably relied upon by the ALJ in formulating the hypothetical presented to the VE which included the limitation of "low-stress, repetitive work"). It is of no moment that the ALJ's first hypothetical did not explicitly reference "attention" or "concentration."

Furthermore, the ALJ's second hypothetical may not have explicitly referenced "concentration, persistence, or pace," but the ALJ's second hypothetical *did* explicitly limit the hypothetical individual to an environment "free of fast-paced production requirements" and no "hourly production

quotas." (AR 73). That hypothetical adequately addressed Parson's pace and concentration limitations. See (Doc. 13-1) (Parson conceding that the ALJ's second hypothetical considered a limitation in pace in this case); *Stewart v Astrue*, 561 F3d 679, 685 (7th Cir 2009), citing *Smith v Halter*, 307 F3d 377, 380 (6th Cir 2001) ("restricting hypothetical to jobs without quotas, rather than to simple tasks, adequately addresses impairment in concentration"). Ultimately, the limitations presented to the VE accurately reflected the record evidence, and substantial evidence of record supports the ALJ's findings as to Parson's limitations in concentration, persistence, and pace.

## C

Finally, Parson argues that the ALJ erred in failing to consider the nature of her problems interacting with others at the job site. Parson argues that the ALJ's RFC finding that, among other things, Parson could have "no more than occasional contact with the general public, coworkers, or supervisors," meant that Parson is capable of being around others for up to thirteen hours every week without any problems responding to contact with those people.[3] Parson argues that finding is irrelevant to the real issue of *how* she would respond when in contact with others at the job site for those thirteen hours. Thus, she contends that the ALJ failed to address the very question that the rulings required of her,[4] and that the VE's testimony based upon the erroneous RFC finding is not

---

[3] Parson cites to SSR 83-10 which defines "occasionally" as "occurring from very little up to one-third of the time."

[4] Parson cites to SSR 85-15 which states:
> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

substantial evidence that other work exists for her. She further argues that it is not possible to tell from the ALJ's Decision why she must be limited in her contact with others. The Commissioner responds that Parson does not provide support in the record for her contention, which is instead contradicted by the evidence in the record.

The Commissioner is correct. The ALJ's finding that Parson could have no more than occasional contact with the general public, coworkers, or supervisors, reading that as Parson does that she is capable of being around others for up to thirteen hours every week without any problems responding to contact with those people, has substantial support in the record. The ALJ explained that the conclusions reached by the physicians employed by the State Disability Determination Services deserved some weight, "particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout [the] Decision)." (AR 23). State agency reviewing psychologist Dr. Boyenga's Mental RFC Assessment indicated that there was no evidence of limitation in the category of "the ability to accept instructions and respond appropriately to criticism from supervisors," and no limitation in the category of "the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (AR 361). His narrative provided that Parson's "[s]ocial skills are impaired, but allow settings with reduced interpersonal contact." (AR 362).

Contrary to Parson's argument that it is not possible to tell from the ALJ's Decision why Parson must be limited in her contact with others, the ALJ's Decision expressly stated in regard to Parson's social functioning that the identified activities Parson engaged in demonstrated that she had no more than moderate difficulties in social functioning, as she was able to actively move

about and interact with persons in the public. (AR 17). The ALJ also expressly stated that:

> Due to the claimant's affective mood disorder, and anticipated difficulties with concentration and social function, the undersigned find [sic] the claimant limited to simple, routine and repetitive type jobs, low stress (with no more than occasional decision making or changes in a work setting), an environment free of fast-paced production requirements, and no more than occasional contact with the general public, coworkers or supervisors.

(AR 25). Reading the ALJ's express statements on the issue of Parson's social functioning in conjunction with the record evidence reveals: a) that the ALJ's RFC finding is substantially supported; and b) she provided an accurate and logical bridge between the evidence and her finding that Parson must be limited to no more than occasional contact with the general public, coworkers or supervisors. See *Murphy v Colvin*, 759 F3d 811, 815 (7th Cir 2014), quoting *Schmidt v Barnhart*, 395 F3d 737, 744 (7th Cir 2005) (explaining that the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence). Accordingly, the VE's testimony based upon the ALJ's RFC finding was substantial evidence that other work existed for Parson, as the hypothetical question posed to the VE represented all of Parson's actual limitations supported by the evidence of record. See *Young*, 362 F3d at 1005 (reversing and remanding where the entire finding of no disability hinged upon the validity of a hypothetical question that was fundamentally flawed because it did not include all of the limitations supported by medical evidence in the record). The ALJ committed no error in regard to her consideration of Parson's problems interacting with others at the job site which would require remand.

## V

For the reasons set forth herein, Parson's Motion for Summary Judgment (Doc. 13) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 17) is GRANTED.  This matter is now terminated.

Entered on June 3, 2015.


s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE